IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BMW OF NORTH AMERICA, LLC;<br>ROLLS-ROYCE MOTOR CARS, NA, LLC;<br>ROLLS-ROYCE MOTOR CARS LIMITED<br>and BAYERISCHE MOTOREN WERKE AG,<br><br>    Plaintiffs,<br><br>  v.<br><br>DINODIRECT CORP.; DINODIRECT CHINA<br>LTD.; B2CFORCE INTERNATIONAL CORP.;<br>and JIANFENG FENG aka KEVIN FENN aka<br>KEVIN FENG,<br><br>    Defendants.<br>_____ / | No. C 11-04598 WHA<br><br>**ORDER GRANTING<br>PLAINTIFFS' MOTION FOR<br>DEFAULT JUDGMENT AND<br>PERMANENT INJUNCTION** |

**INTRODUCTION**

In this trademark infringement action, plaintiffs move for default judgment against defendants. In addition to a permanent injunction, plaintiffs seek statutory damages and attorney's fees. For the following reasons, plaintiffs' motion for default judgment is **GRANTED,** and plaintiffs' requests for a permanent injunction and statutory damages are also **GRANTED**.

**STATEMENT**

**1.    THE PARTIES.**

Plaintiffs are Rolls-Royce Motor Cars Limited, a British company, Rolls-Royce Motor Cars NA, LLC, a Delaware limited liability company, Bayerische Motoren Werke AG, a publicly traded German company, and BMW of North America, LLC, a Delaware limited

liability company (First Amd. Compl. ¶¶ 1–5). Rolls-Royce Motor Cars Limited and Rolls-Royce Motor Cars NA, LLC are wholly-owned subsidiaries of BMW (US) Holding Corp., which in turn is a wholly owned subsidiary of plaintiff Bayerische Motoren Werke AG (*ibid*.). BMW of North America, LLC is a wholly-owned indirect subsidiary of Bayerische Motoren Werke AG (*ibid*.). Plaintiffs design, manufacture and distribute motor vehicles, automotive parts and lifestyle items and own exclusive rights under the Trademark Act to various marks that are used in connection with the sale and distribution of their products (*id*. ¶ 22).

Corporate defendants are DinoDirect Corp., a Delaware corporation (DinoDirect), DinoDirect China Ltd., a Hong Kong limited liability company (DinoDirect China), and B2CForce International Corp., a California corporation (B2CForce) (*id*. ¶¶ 6–9). JianFeng Feng aka Kevin Fenn aka Kevin Feng (Mr. Feng), an individual defendant, serves as President and CEO of both DinoDirect China and DinoDirect and is the founder of B2CForce (*ibid*.). Defendants are allegedly affiliated, with B2CForce and DinoDirect operating www.dinodirect.com (the website) and DinoDirect China fulfilling orders placed through the website (*ibid*.). Mr. Feng allegedly runs DinoDirect and B2CForce from his home (*ibid*.). Defendants allegedly advertised and sold counterfeit BMW and Rolls Royce products through the website, as well as through a related wholesale center, www.dinodirect.com/wholesale.html (the wholesale page) (*id*. ¶¶ 10, 27, 31).

**2. TIMELINE OF EVENTS.**

After members of BMW's brand protection team discovered that counterfeit products bearing plaintiffs' trademarks were being sold from the website and wholesale page (Stoiber Decl. ¶¶ 2–5), plaintiffs' counsel retained the services of a private investigator named Mr. Cliff Petrovsky to "develop background facts" regarding defendants (Petrovsky Decl. ¶ 3). Mr. Petrovsky's firm purchased several products bearing various BMW trademarked logos from the website in early June 2010 and August 2011 (*id*. ¶¶ 4–16). These products, which were shipped from China, arrived in boxes marked with DinoDirect's name, logo and web address (*ibid*.). The packages also included stickers marked "quality certified" and "www.dinodirect.com" (*ibid*.). The invoice for the June 2010 package included a Palo Alto,

2

California address for "DinoDirect, Inc." (*ibid.*).  The invoice for the August 2011 package included a "customer satisfaction" phone number with an area code covering San Mateo County, California as well as company addresses in Los Angeles, mainland China, Hong Kong, the United Kingdom and Quebec (*ibid.*).

Plaintiffs filed their initial complaint against defendants on September 16, 2011. Plaintiffs' initial complaint identified the wrong Mr. Feng as a defendant.  Plaintiffs filed their first amended complaint (the complaint) on October 11, 2011, identifying the correct Mr. Feng and detailing additional instances of alleged trademark infringement by defendants. On October 13, 2011, plaintiffs served the complaint on DinoDirect via its registered agent in Delaware.  It appears that individuals affiliated with DinoDirect China became aware of this action prior to service of the complaint, as Mr. Feng's secretary, Ms. Jenney Zheng, composed a letter filed by this Court on September 29, 2011 disputing some claims set forth by plaintiffs in their complaint (Dkt. No. 9).  In the letter, Ms. Zheng claimed that DinoDirect China is merely a drop-shipper and does not manufacture or supply any of the BMW-marked items featured on their website (*ibid.*). Ms. Zheng also claimed that DinoDirect China is not affiliated with any United States subsidiaries (*ibid.*).  On October 20, 2011, another letter written by Ms. Zheng on behalf of DinoDirect China was filed with this Court (Dkt. No. 16).  In this letter, Ms. Zheng disputed other allegations asserted in plaintiffs' complaint, claiming that DinoDirect China "has no connection with . . . B2CForce and DinoDirect Corp." (*ibid.* ¶ 3).

On November 4, 2011, Mr. Feng waived service and acknowledged receipt of the complaint (Dkt. No. 21). On December 5, 2011, DinoDirect China also waived service and acknowledged receipt of the complaint (Dkt. No. 30).  This Court granted an order for plaintiffs to serve B2CForce via the California Secretary of State on January 23, 2012 (Dkt. No. 38) and reissued the order on March 19, 2012 (Dkt. No. 43).  On April 4, 2012, plaintiffs perfected service on the Secretary of State (Dkt. No. 48).  Between February and April of 2012, plaintiffs attempted to participate in at least three rounds of court-ordered telephonic alternative dispute resolution with defendants and Mediator Daniel Bowling, but defendants failed to appear each time (Dkt. No. 63-1, 9–24).  On March 19, 2012, the Court Clerk granted default as to

defendants DinoDirect China, DinoDirect and Mr. Feng (Dkt. No. 44).  On May 1, 2012, the Court Clerk granted default as to defendant B2CForce (Dkt. No. 54).

On May 15, 2012, DinoDirect China sent a letter to the Court Clerk and plaintiffs' attorneys, again disputing claims made in plaintiffs' complaint and insisting that as a mere drop-shipper, DinoDirect China was not a "real defendant" because it "never directly sold any products" marked with a BMW logo (Dkt. No. 59).  On May 16, 2012, plaintiffs moved for default judgment against all defendants.  Between May 17 and May 23, Ms. Zheng, writing on behalf of DinoDirect China, exchanged several emails with this Court inquiring as to why ADR had ended and what the next steps in the legal process involved (Dkt. No. 60).  Ms. Zheng also attached a response to plaintiffs' complaint to one of her emails (*ibid*.).  This response was filed on May 22, 2012 and re-asserted the claim that as a mere "online shopping platform . . . providing a channel to sell products for the suppliers" DinoDirect China is not a "real defendant."  The response also claimed that DinoDirect China made no profit from presence of counterfeit BMW goods on its website, and that DinoDirect China had already been trying to cooperate positively with plaintiffs to resolve this action out of court (*ibid*.).  The response also requested that the action be heard in Chinese court (*ibid*.).  Ms. Zheng emailed this Court again on June 1, 2012, asking to either move this action to a Chinese court or reconcile out of court (Dkt. No. 63).  She also attached a slightly modified copy of DinoDirect China's May 22 response to plaintiffs' complaint (*ibid*.).  This version of the response also included what appear to be several exhibits, attached as "proof" to help support claims made by Ms. Zheng on behalf of DinoDirect China (*ibid*.).  Ms. Zheng sent another nearly identical email to this Court on June 7, 2012 (Dkt. No. 64).

On June 18, 2012, this Court notified the parties that the hearing for this action, originally scheduled for June 21, 2012, was rescheduled for June 20, 2012 (Dkt. No. 66).  On June 19, 2012, this Court issued a notice informing defendants that their emails to this Court were not an acceptable form of communication in this action, did not count as an appearance, and should cease immediately (Dkt. No. 70).  This Court also informed defendants that if they failed to appear via counsel at the hearing scheduled for June 20, default judgment would likely be

4

1  granted against them (*ibid*.).  This Court offered defendants the opportunity to appear via
2  counsel in order to procure a short extension so that they could move to set aside plaintiffs'
3  motion for default judgment (*ibid*.).  However, defendants failed to appear at the hearing.
4  Instead, defendants DinoDirect China and Mr. Feng sent two identical emails to this Court on
5  June 19, 2012 (Dkt. No. 68-1, Dkt. No. 69).  In the emails, defendants informed this Court that
6  they would be unable to attend the scheduled hearing, asked this Court to assign them a lawyer,
7  and disputed some of plaintiffs' claims asserted in the complaint (*ibid*.).

**3.   JURISDICTION.**

**A.   This Court Has Jurisdiction Over Defendants.**

*(1)   General Jurisdiction.*

A court has general jurisdiction over foreign corporations when they have "continuous and systematic" contacts with the forum state.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984).  The standard for establishing general jurisdiction requires that the defendant's contacts be of the sort that approximate physical presence.  *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984).  Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there.  *See Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986).  In the context of Internet web sites, the Ninth Circuit looks beyond these traditional factors to the realities of e-commerce.  *Gator.com Corp. v. L.L. Bean, Inc.,* 341 F.3d 1072, 1080 (9th Cir. 2003) *vacated as moot on reh'g en banc on basis of settlement*.[*]  In *Gator*, the Ninth Circuit held that California had general jurisdiction over L.L. Bean, a Maine corporation, because of its high volume of online sales to customers in California through its "sophisticated

---

[*] Although *Gator* is no longer controlling because the parties' settlement rendered the case moot, many courts in this Circuit continue to look to the Ninth Circuit's reasoning in *Gator* as persuasive. *See West Marine, Inc. v. Watercraft Superstore, Inc.,* 2012 WL 479677 at *4 (N.D. Cal. 2012) (Lloyd, J.) (finding general jurisdiction where defendant operated two web sites, one of which operated as a "highly interactive" e-commerce store "just like a brick and mortar store" and "largely designed so as to approximate physical presence in a forum."); *see also Coremetrics, Inc. v. Atomic Park.com, LLC,* 370 F. Supp.2d 1013, 1021 (N.D. Cal. 2005) (Chen, J.) (finding general jurisdiction over e-commerce store where "consumers may window shop by browsing the website and actual sales are made directly to consumers online").

5

virtual store." *Id.* at 1078.  For the same reason, this Court has general jurisdiction over DinoDirect China. Not only does DinoDirect China have several physical locations in California according to their website and product invoices (Jacquette Decl. ¶¶ 4, 12; Petrovsky Decl. ¶ 13), DinoDirect China also operates a sophisticated e-commerce sight that garners a significant amount of business from California customers (Jacquette Decl. ¶ 11).  As for defendant B2CForce, this Court has general jurisdiction because it is a California corporation registered with the Secretary of State with a designated agent for service of process in California.

### *(2)     Specific Jurisdiction.*

This Court also has specific jurisdiction over all defendants in this action.  The Ninth Circuit applies a three-part test to claims of specific jurisdiction against non-resident defendants. First, "the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof."  Second, "the claim must be one which arises out of or relates to the defendant's forum-related activities."  Third, "the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable." *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. 2004).  If the plaintiff satisfies the first two parts of the test, it is the defendant's burden to present a "compelling case" as to why the exercise of jurisdiction is unreasonable.  *Symantec Corp. v. Johns Creek Software, Inc.*, 2011 WL 4026873 at *2–3 (N.D. Cal. 2011) (Alsup, J.).

The first prong of the test is met by applying the effects test from *Calder v. Jones,* 456 U.S. 783 (1984).  *Id*. at *2–3.  "This test requires that the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Ibid*.  The "[c]reation and operation of web sites are intentional acts for purposes of the *Calder* test."  *Ibid*. (citing *Brayton Purcell LLP v. Recordon & Recordon,* 606 F.3d 1124, 1128–29 (9th Cir. 2010)).  Courts in this district have held that a defendant's creation and operation of an interactive website with content infringing upon registered trademarks satisfies the first part of the *Calder* test. *See Sanrio, Inc. v. Jay Yoon*, 2012 WL 610451 at *3 (N.D. Cal. 2012) (Davila, J.) (on motion for default judgment, the court held that defendant's operation of an interactive website selling infringing goods to

6

California customers satisfied the first prong of the *Calder* test); *Gucci America, Inc. v. Wang Huoquing*, 2011 WL 31191 at *6 (N.D. Cal. 2011) (Spero, J.) (same); *Chanel v. Lin*, 2010 WL 2557503 at *5 (N.D. Cal. 2010) (Spero, J.) (same). In this action, all four defendants have been involved in the creation and operation of www.dinodirect.com as well as the shipment of infringing goods to California customers (Jaquette Decl. ¶¶ 2–5, 7–9, 16, 19; Petrovsky Decl. ¶¶ 12, 19–20).

The second prong of the test requires that a plaintiff's claims arise out of or relate to a defendant's activities in the forum. *Sanrio,* 2012 WL 610451 at *3. When a defendant sells infringing products to California consumers, the second prong of the test is "plainly" met. *Ibid.* Here, defendants have sold their products to California consumers, including BMW's investigator in Santa Cruz (Petrovsky Decl. ¶ 11–17) as well as several hundred other California customers who have complained about defendants' business to the Better Business Bureau (Jaquette Decl. ¶ 11). Therefore, plaintiffs' claims arise out of or relate to defendants' activities in this jurisdiction.

The third prong of the test requires that defendants show why the exercise of jurisdiction would be unreasonable. *Symantec*, 2011 WL 4026873 at *2–3. As defendants have not appeared in this action, they have failed to meet their burden. Therefore, this Court may properly exercise jurisdiction over all defendants in this action.

**4.   SERVICE AND PLAINTIFFS' FAILURE TO APPEAR.**

Civil Local Rule 3-9(b) states that "[a] corporation, unincorporated association, partnership or other such entity may appear only through a member of the bar of this Court." Civil L.R. 3-9(b). "This regulation reflects the longstanding rule that a corporation may only appear in court through an attorney." *U.S. Commodity Futures Trading Comm'n v. Castillo*, 2007 WL 2088372 at *1 (N.D. Cal. 2007) (Henderson, J.) (citing *In re Am. W. Airlines*, 40 F.3d 1058, 1059 (9th Cir. 1994)). "Non-attorneys, including a corporation's president and sole shareholder, are barred from representing a corporation." *Ibid*. Defendants DinoDirect, DinoDirect China and B2CForce are corporations within the meaning of Civil Local Rule 3-9(b) such that only a member of the bar of this Court may represent them. Neither Mr. Feng nor

7

1 Ms. Zheng are members of the bar of this or any other court and may not represent the corporate
2 defendants in this action. Therefore, Mr. Feng and Ms. Zheng's electronic correspondence,
3 written on behalf of DinoDirect and DinoDirectChina, may not be considered properly filed
4 answers to plaintiffs' complaint.

5 Defendant DinoDirect was properly served via its registered agent on record with the
6 Delaware Secretary of State (Dkt. No. 17). Defendant DinoDirect China waived service
7 pursuant to FRCP 4 and acknowledged receipt of the complaint (Dkt. No. 30). Mr. Feng,
8 as DinoDirect China's President, signed the waiver of service of summons form on the
9 corporation's behalf (*ibid*.). Defendant B2CForce was properly served via the California
10 Secretary of State (Dkt. No. 48). None of these defendants filed an answer or opposition with
11 this Court, and thus default judgment may be granted against them. Defendant Mr. Feng waived
12 service pursuant to FRCP 4 (Dkt. No. 21). As an individual, Mr. Feng could have elected
13 to represent himself *pro se* in this action. The waiver of service form that Mr. Feng signed
14 gave him the opportunity to file an answer or motion under FRCP 12 within ninety days from
15 December 5, 2011 (*ibid*.). However, the first time Mr. Feng ever personally contacted this Court
16 with regard to this action was on June 19, 2011, when he emailed a signed letter disputing some
17 of plaintiffs' claims against DinoDirect and DinoDirect China (Dkt. No. 69). This letter arrived
18 outside the ninety day time frame that Mr. Feng had under FRCP 12 to respond to plaintiffs'
19 complaint, was not filed properly, and did not actually address any of plaintiffs' claims against
20 him personally. Therefore, Mr. Feng has not filed an answer or opposition with this Court and
21 default judgment may be granted against him. This order will now address plaintiffs' motion
22 for default judgment, permanent injunction, statutory damages, and attorney's fees.

**ANALYSIS**

**1.     DEFAULT JUDGMENT.**

25 Under FRCP 55(b)(2), a plaintiff can apply to the district court for a default judgment
26 against a defendant that has failed to otherwise plead or defend against the action.
27 Default judgments are generally disfavored as "cases should be decided upon their merits
28 whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986).

8

In the Ninth Circuit, a district court must consider the following factors when deciding whether or not to use its discretion in granting a motion for default judgment: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Id.* at 1471–72. Here, these factors favor entry of default judgment against all defendants.

### A. Merits and Sufficiency of the Complaint.

After an entry of default, well-pled allegations in the complaint are deemed true, except for the amount of damages. *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). The merits of plaintiffs' substantive claims and sufficiency of the complaint are thus considered together. Plaintiffs claim that defendants infringed upon several of their trademarks. To prevail on a claim of trademark infringement, plaintiffs must prove that: (1) they own the rights to a valid trademark and (2) that defendants' use of the mark in interstate commerce is likely to cause consumer confusion. *KP Permanent Make-Up Inc., v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005).

Here, the complaint alleges that plaintiffs own a number of trademarks bearing the BMW and Rolls Royce marks in the United States, that the marks are registered with the USPTO and that defendants used the marks on counterfeit products sold on their website (First Amd. Compl. ¶¶ 22–34). Taking these well-pled allegations as true, plaintiffs sufficiently plead the elements necessary to establish that defendants infringed upon their trademarks.

### B. Remaining Factors.

This order finds that the remaining *Eitel* factors likewise favor entry of default judgment. First, plaintiffs will be prejudiced if default judgment is not granted. If default judgment is not granted, plaintiffs will be denied the right to adjudicate their claims and defendants' conduct will remain unimpeded. Defendants are aware of this action and have been given a fair opportunity to work within the ADR system as well as to properly adjudicate this case before a district judge, yet they have chosen not to participate. Consequently, plaintiffs have no other option but to seek

9

default judgment as defendants are unwilling to appear. Second, plaintiffs seek an award of no less than $13.5 million for defendants' willful trademark counterfeiting (Mot. 25). Generally, the fact that a large sum of money is at stake disfavors default judgment. *Eitel*, 782 F.2d at 1472. As described below, however, the damages are statutory and the amount is left to the court's discretion. Third, while Ms. Zheng and Mr. Feng's various letters to this Court indicate that there may be a factual dispute between DinoDirect, DinoDirect China and plaintiffs regarding the nature of DinoDirect China and DinoDirect's business activities, neither Mr. Feng nor Ms. Zheng are legally permitted to represent DinoDirect or DinoDirect China in this district. *See* Civil L.R. 3-9(b). Therefore Ms. Zheng and Mr. Feng's letters cannot be used to form the basis of a dispute between plaintiffs and defendants. Fourth, there is nothing excusable in regards to defendants' actions. Defendants were properly served with the complaint and motion for default judgment but did not properly file an answer or opposition. Fifth, although federal policy favors decisions on the merits, the circumstances surrounding this case indicate that default judgment under FRCP 55(b) is proper. Rule 55(b) allows the entry of default judgment in situations such as this, where the defendants have refused to litigate. *See Microsoft Corp. v. Ricketts*, 2007 WL 1520965 at *3 (N.D. Cal. 2007) (Alsup, J.). This order concludes that the balance of the *Eitel* factors weigh in favor of entry of default judgment.

### 2. PERMANENT INJUNCTION.

This order will now discuss the relief that plaintiffs request. Plaintiffs first seek a permanent injunction to prevent future infringement of their trademarks (Mot. 25). Injunctive relief is available to prevent future trademark infringement under the Lanham Act. 15 U.S.C. 1116(c). By using plaintiffs' trademarks, defendants were representing their counterfeit goods as though they were endorsed and/or created by plaintiffs, making it likely that consumers would be confused (First Amd. Compl. ¶ 35(a)). Plaintiffs, therefore, are entitled to injunctive relief.

Pursuant to 15 U.S.C. 1116, this order enjoins defendants from using any of plaintiffs' trademarks in any way and requires defendants to file with this Court and serve on plaintiffs within thirty days after entry of this order, a report in writing and under oath detailing the

manner in which defendants have complied with the injunction. For this Court's contempt power to apply to this injunction, defendants "must receive actual notice of the order by personal service or otherwise." FRCP 65(d). Plaintiffs are instructed to provide proper service of this order, by personal service, no later than July 6, 2012. Plaintiffs shall also file proof of service.

### 3. STATUTORY DAMAGES.

Plaintiffs also request at least $13.5 million dollars for statutory damages based on defendants' willful counterfeiting of their trademarks. For trademark actions involving the use of a counterfeit mark, a plaintiff may recover statutory damages at any time before final judgment is entered. 15 U.S.C. 504(c)(2). In its discretion, a court can award not less than $1,000 or more than $200,000 for each counterfeit mark. 15 U.S.C. 1117(c)(1). In cases where the infringement is willful, the maximum amount that may be awarded per counterfeit mark is $2,000,000. 15 U.S.C. 1117(c)(2).

In order to be entitled to an award for statutory damages based on defendants' willful counterfeiting, plaintiffs must establish that: (1) defendants intentionally used a counterfeit mark in commerce; (2) knowing the mark was counterfeit; (3) in connection with the sale, offer for sale, or distribution of goods; and (4) defendants' use was likely to confuse or deceive consumers. *Lindy Pen Co. v. Bic Pen Co.*, 982 F.2d 1400, 1406 (9th Cir. 1993). The complaint alleges sufficient facts to establish that plaintiffs are entitled to statutory damages. It alleges that defendants knew plaintiffs owned the rights to the registered trademarks, that defendants decided to copy the marks anyway and use them in conjunction with the sale of counterfeit BMW and Rolls Royce goods, and that defendants' use was likely to deceive consumers (First Amd. Compl. ¶¶ 1–46). The facts as alleged clearly establish that defendants engaged in willful trademark counterfeiting and that plaintiffs are entitled to an award of statutory damages.

Plaintiffs will not, however, be granted $13.5 million dollars. The amount requested is too great. It is true that plaintiffs could not conduct discovery to determine their damages, but that in itself simply does not support levying a statutory damages award in excess of ten million dollars. *See Chanel, Inc. v. Doan*, 2007 WL 781976 at *5 (N.D. Cal. 2007) (Walker, J.). Statutory damages are intended to serve as a deterrent, but that does not justify such a windfall.

11

*See Microsoft Corp. v. Coppola*, 2007 WL 1520964 at *4 (N.D. Cal. 2007) (Alsup, J.) (citing *Peer Int'l. Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1336 (9th Cir. 1990). "To calculate statutory damages under the Lanham Act, many district courts turn to the analysis developed for a similar provision within the Copyright Act." *Chanel*, 2007 WL 781976 at *5. "Under the Copyright Act, the court has wide discretion in calculating statutory damages, 'constrained only by the specified maxima and minima.'" *Ibid*. (citing *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984). "Plaintiff[s] may recover statutory damages without offering evidence of plaintiffs' actual damages or the defendants' profits because of the dual 'compensatory and punitive purposes' of statutory damages." *Ibid*. (citing *Los Angeles News Service v. Reuters Television Int'l. Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998)). "Although the statutory damages need not reflect the defendants' unlawfully obtained profits, some district courts use § 1117(b) [statutory damages provision for copyright infringement] as a guide for setting damages under § 1117(c)." *Ibid*. "In doing so, courts both counteract the profitability of counterfeiting and execute the punitive purposes of the statute." *Ibid*. (citing *Los Angeles News Service*, 149 F.3d at 996). Accordingly, this Court believes it is just to award statutory damages in the amount of $1.5 million dollars for defendants' willful trademark infringement. Coupled with the permanent injunction, the award will adequately serve the purpose of deterring future violations as well as compensating plaintiffs.

### 4. ATTORNEY'S FEES.

Plaintiffs' final claim for relief is for "reasonable" attorney's fees and costs for pursuing this action (First Amd. Compl. ¶ 71(4)(c)). For trademark infringement cases, monetary recovery in the form of reasonable attorney's fees and costs are available to the prevailing party in "exceptional" cases. 15 U.S.C. 1117(a). A case may be considered exceptional when some degree of culpability is found on the part of the party from whom such fees are sought. Such culpability may be established based on defendants' deliberate, fraudulent, malicious or willful conduct. *See Derek Andrew, Inc. v. Poof Apparel Corp.*, 588 F.3d 696, 702 (9th Cir. 2008). Here, plaintiffs allege that defendants willfully infringed upon their trademarks. Taking these allegations as true, plaintiffs may be entitled to attorney's fees and costs.

However, this order will not decide on the issue of plaintiffs' attorney's fees as plaintiffs have not provided any indication of the actual cost of their attorney's services to this Court.

**CONCLUSION**

For good cause shown, this order **GRANTS** plaintiffs' motion for default judgment, permanent injunction, and statutory damages. Defendants shall pay plaintiffs statutory damages in the amount of $1.5 million dollars. Defendants, their parents, affiliates, subsidiaries, and their respective officers, agents, servants, employees, independent contractors and attorneys, or any other person or entity acting in concert or participating with anyone described above, and any successor in interest or future owners of defendants, shall be immediately and permanently enjoined from:

1. Designing, creating, manufacturing, advertising, marketing, promoting, offering for sale, ordering, accepting orders for, providing the means to order, brokering, selling, warehousing, delivering, shipping, importing, exporting, distributing or accepting shipment or delivery of, any products that are not made or authorized by BMW that depict or bear the BMW Marks or any other trademark or logo of BMW or colorable imitations thereof, or facilitating, inducing or assisting any of the activity set forth above;

2. Operating or hosting any website that sells or offers to sell goods using counterfeit reproductions of the BMW Marks or any colorable imitations thereof or any other trademark of BMW's;

3. Displaying BMW's logos or colorable imitations thereof, including but not limited to BMW's Roundel logo, RR Badge, M-Stripes logo, and MINI Wings logo, on any website, in promotional or marketing materials, or otherwise in connection with their business;

4. Advertising or describing products that are not by BMW, Rolls-Royce, or MINI as "BMW," "Rolls-Royce," or "MINI" products, or otherwise using BMW's trademarks or colorable imitations thereof as or in the names, titles, and listings of products not made or authorized by BMW;

5. Doing any other act or thing likely to confuse, mislead, or deceive others into believing that defendants emanate from, are connected with, sponsored by, licensed by, or approved by, BMW, or that defendants' products and services are sponsored, licensed or approved by BMW or aiding and abetting others to do so;

6. Otherwise engaging in activity likely to dilute BMW's Roundel logo, "BMW" word mark, RR Badge or any other trademark of BMW's;

7. Utilizing or registering any domain names or sub-domain names that use or incorporate any of BMW's trademarks;

8. Making any other trademark use of the "BMW" mark, "BMW Group," or "Z8" mark, or any other BMW trademarks or colorable imitations thereof, including use of BMW's trademarks in metatags or any visible use of BMW's trademarks in Google Adwords or other keyword advertising; and

9. Facilitating, inducing, assisting, aiding, abetting, or supplying the means for any other person or business entity to engage in or perform any of the activities referred to in the above subparagraphs 1–7, or effecting any assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs 1–7.

**IT IS FURTHER ORDERED** that defendants are directed to:

10. Permanently delete and remove and recall from all web sites, blogs, online auctions, stores, shops, markets outlets, catalogues, or other channels of commerce any listings for goods bearing counterfeits of the BMW marks, or any other non-genuine product confusingly similar to plaintiffs' products, or that otherwise bear, contain, display or utilize BMW marks, any derivation or colorable imitations thereof;

11. In accordance with Section 36 of the Federal Trademark Act, 15 U.S.C. 1118, deliver up for destruction all counterfeit goods that bear

14

plaintiffs' marks or colorable imitations thereof, that are in defendants' possession, custody, or control;

12. In accordance with Section 36 of the Federal Trademark Act, 15 U.S.C. 1118, deliver up for destruction any and all guarantees, circulars, price lists, labels, signs, prints, packages, wrappers, pouches, receptacles, advertising and promotional matter, electronic files, and other materials in the possession or control of defendants bearing the BMW marks, or any derivation or colorable imitations thereof;

13. File with this Court and serve on counsel for plaintiffs within thirty days after entry of this order, a sworn written statement pursuant to Section 34(a) of the Federal Trademark Act, 15. U.S.C. 1116(a), setting forth in detail the manner and form in which defendants have complied with this order. For this Court's contempt power to apply to this injunction, defendants "must receive actual notice of the order by personal service or otherwise." FRCP 65(d). Plaintiffs are instructed to provide proper service of this order, by personal service, no later than July 6, 2012. Plaintiffs shall also file a copy of the proof of service.

**IT IS FURTHER ORDERED** that:

14. Defendants are jointly and severally liable for $1.5 million dollars in statutory damages pursuant to 15 U.S.C. 1117(c) as a result of their willful advertisement and sale of counterfeit BMW products, and that defendants shall immediately pay plaintiffs this amount;

15. In accordance with Section 34 of the Federal Trademark Act, 15 U.S.C. 1116, the Clerk of the Court shall notify the Commissioner of Patents

15

and Trademarks of the entry of this final judgment who shall enter it upon the records of the United States Patent and Trademark Office.

**IT IS SO ORDERED.**

Dated: June 27, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE